DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Andrew Lewis, appeals from the judgment of the Summit County Court of Common Pleas which convicted him of theft against the elderly and sentenced him to eighteen months of community control. We affirm.
 {¶ 2} On May 14, 2003, the Summit County Grand Jury indicted Defendant for theft from elderly, in violation of R.C.2913.02(A)(3). Following a trial, a jury found Defendant guilty of the charge. The trial court sentenced Defendant to eighteen months of community control and ordered Defendant to pay the victim restitution of $1,900. Defendant timely appealed raising one assignment of error.
 ASSIGNMENT OF ERROR
"[Defendant's] conviction for theft by deception was based upon insufficient evidence as a matter of law, and was against the manifest weight of the evidence."
 {¶ 3} In his only assignment of error, Defendant asserts that insufficient evidence supported his conviction, or, in the alternative, that his conviction was against the manifest weight of the evidence. Defendant alleges that the State offered no evidence tending to show that he knowingly deceived the victim, Mary Lou Watson ("Watson"). We find no merit in Defendant's argument.
 {¶ 4} Sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52. As to sufficiency, Crim.R. 29(A) states that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." However, if the record demonstrates that reasonable minds may reach differing conclusions as to the proof of material elements of a crime, a trial court may not grant a Crim.R. 29(A) motion for acquittal. State v. Smith, 9th Dist. No. 20885, 2002-Ohio-3034, at ¶ 7, citing State v. Wolfe
(1988), 51 Ohio App.3d 215, 216. "`In essence, sufficiency is a test of adequacy.'" Smith at ¶ 7, quoting Thompkins,78 Ohio St.3d at 386.
 {¶ 5} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant maintains that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
 {¶ 6} This power is to be invoked only in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id. A finding that a conviction is supported by the weight of the evidence, also includes a finding of sufficiency of the evidence. Smith at ¶ 9, quotingState v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4.
 {¶ 7} A jury convicted Defendant of theft under R.C.2913.02(A)(3) which prohibits a person, "with purpose to deprive the owner of property or services, [from] knowingly obtain[ing] or exert[ing] control over either the property or services * * * [b]y deception[.]" Deception includes:
"knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A).
 {¶ 8} One purposely deprives another of property or services when he has the specific intent to (1) withhold property permanently, for a long enough time period that the property or service loses a substantial portion of its value, or with the specific intent to return the property only for monetary or other consideration, (2) dispose of the property in a way that makes it difficult or unlikely for the owner to recover it, or (3) "[a]ccept, use, or appropriate money * * * with purpose not to give proper consideration in return for the money * * * and without reasonable justification or excuse for not giving proper consideration." R.C. 2913.01(C). See R.C. 2901.22(A). An individual "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Where the victim is elderly, and the defendant steals between $500 and $5,000 worth of services or property, theft is a fourth degree felony. R.C. 2913.02(B)(3).
 {¶ 9} Watson, who is 73 years old, testified that a friend referred her to Defendant for remodeling work. Watson wanted to remodel her kitchen and bathroom. Defendant visited her home in March 2001 to give her an estimate for costs associated with the work. He left her a list of materials for her to purchase necessary to complete the remodeling project, and referred her specifically to two suppliers. Before the end of March, Watson had personally visited the recommended suppliers and purchased all of the necessary supplies. Watson stated that Defendant did not seem interested in helping her get the materials, and that he was not involved in any way with those purchases. Watson spent more than $2,500 on those recommended supplies.
 {¶ 10} Watson signed a remodeling contract with Defendant at her home in Cuyahoga Falls, Summit County, Ohio, on April 2, 2001. The contract stated that Defendant would begin remodeling work on April 16, 2001, as long as all of the purchased materials were available. Watson understood that Defendant would deliver the materials to her home from the suppliers. She gave Defendant a $1,900 check, half of the estimated labor costs, as a deposit for the remodeling work.
 {¶ 11} Watson verified with the suppliers that all of her materials were available on April 16, 2001. However Defendant did not begin remodeling Watson's home on that date; he did not call Watson to explain his failure to begin work; he made no appearance at Watson's home that day. In fact, Defendant did not contact Watson regarding her remodeling contract until July 12, 2001, and then only in response to a telephone call made by Watson to Defendant on July 10th. At that point in time, Defendant indicated that he would be unable to start work until August 1st, but that he "thought [Watson] would feel better if he delivered part of the material[.]" Defendant also told Watson that "if [she] bothered him again [about the start date] he would make [her] wait twice as long before he started." Defendant did not put in writing the modified August 1st start date.
 {¶ 12} Defendant delivered a portion of the materials on July 13, 2001. They remained untouched, filling Watson's garage for approximately a year. Defendant did not begin work on August 1, 2001. "[T]hat, of course, came and went and [Watson] never heard from [Defendant] again." Watson was afraid to contact Defendant directly because she did not want him to make her wait longer. She was also "in a frenzy because the rest of [her] material wasn't there. It remained in some storeroom over at * * * [a supplier's] for a long time."
 {¶ 13} Watson finally contacted an attorney to address the situation. The attorney spoke to Defendant in March, 2002. Defendant indicated that he was trying to get in touch with Watson. Watson, however, had not moved and had an answering machine, yet never received any telephone calls or correspondence from Defendant or his company. Defendant, to Watson's knowledge, never offered to return her $1,900 deposit. Watson finally approached the police with her complaint. Following an investigation, the theft against elderly charge was filed.
 {¶ 14} Watson eventually hired someone to deliver the rest of her materials, and contracted with another company to remodel her kitchen and bath. As of the date of trial, Defendant had never returned any of her $1,900 deposit, nor done any remodeling work on her home.
 {¶ 15} Three employees of the two suppliers testified at trial. They indicated that the invoices involved showed application of a contractor discount of between 10% and 25%, depending upon the supplier. In order to receive such a discount, the contractor would either need to be present at the purchase or call to approve his customer's purchase. Both suppliers said materials would have been available either immediately, or, at the latest, within six weeks of Watson's March 30, 2001 order. If Watson, as she testified, did call to verify arrival of all her orders, the supplier would never tell her they were ready unless they were, in fact, available for pick up. One supplier insisted that contractors generally picked up materials for their customers, though she admitted the practice varied depending upon the contractor and the individual purchaser.
 {¶ 16} One employee, Michael Franks ("Franks"), recalled that, approximately one year after the purchase, Defendant came to the store on unrelated business. Franks asked Defendant when he would be picking up Watson's materials. Defendant "told [Franks] that [Watson] was either sick, or in an accident, [or] on vacation[,]" though Franks did not specifically recall exactly what Defendant said. Watson denied that she was incapacitated in any way during that time. Defendant denied telling Franks that Watson was in any way incapacitated. He simply did not deliver Watson's materials because "[t]hey weren't [his] to pick up."
 {¶ 17} Defendant testified in his own defense. Traditionally, Defendant would inspect the homes of prospective customers to give them a cost estimate and a list of necessary supplies. Defendant offered this service at no charge. After his initial meeting with Watson, he stated that he met Watson at one supplier to aid in her purchases, and called to tell the second supplier that Watson would be coming in. He then called the supplier after Watson made her purchase to verify application of his contractor's discount. Watson disputed that Defendant helped her purchase materials or accompanied her to either of the suppliers.
 {¶ 18} Defendant agreed that he and Watson signed a $3,800 contract at her home on April 2, 2001. Defendant, however, insisted that the contract price covered items beyond labor, including drywall, copper wiring, paint, and subfloors, but did not include delivery of Watson's purchases. Rather, Watson was required to have all of the materials delivered to her home. Defendant maintained that unless Watson hired someone to deliver the supplies to her home prior to the April 16th start date, the contract did not obligate him to begin work. Defendant collected a $1,900 deposit check from Watson, and, in contrast to Watson's recollection, also picked up checks for the two suppliers which he delivered that same day.
 {¶ 19} Defendant explained that he did not begin work on April 16, 2001 because the necessary materials were not yet available. Only when the materials became available, around July 10, 2001, did he speak with Watson. He then delivered a portion of her materials on July 13th, and said that he would begin remodeling work on August 1st. Defendant stated, however, that the second start date was contingent upon Watson's cleaning out her basement. Defendant indicated that Watson's basement was so cluttered that he could not maneuver to install the new wiring and drains needed in the basement. Watson vehemently denied this, and said the Defendant never told her that she needed to clean anything in her basement.
 {¶ 20} When Defendant heard nothing more from Watson, he assumed that she did not have the money to finance the project.
"We assume when people don't call back they don't have the money for the remainder so they'll wait until they have the money for the remainder of the contract. No need to have somebody working on your home if you don't have the remainder of the money."
 {¶ 21} Watson did not speak with Defendant again. Instead, Watson's attorney contacted Defendant around March 2002. According to Defendant, Watson's attorney demanded reimbursement of $5,400, including the $1,900 deposit and costs Watson expended to suppliers for materials. Defendant would also need to pick up all the materials in Watson's garage, and could do with them as he saw fit. Defendant refused, though he offered to return Watson's deposit.
 {¶ 22} Defendant asserts that Watson's attorney called him back a week later to accept return of the deposit. Defendant, however, demanded a written release from Watson. He never received a release, and, therefore, never returned Watson's deposit. The attorney did not call Defendant again.
 {¶ 23} Six or seven months later, Defendant received a call from a detective with the Cuyahoga Falls Police Department who "was kind of vague about wanting to speak to [Defendant]." When he spoke with the detective, Defendant again offered to return Watson's deposit.
 {¶ 24} On the date of trial, however, Defendant considered the return of Watson's deposit in a different manner:
"Q. As of today are you willing to return some of the money to [Watson]?
"A. As of today, of course, but not all of it today. Not all of it today."
Instead, Defendant explained that he was entitled to some of the money because he saved Watson about 25% with his contractor's discount and spent around fifteen hours preparing for the remodeling job. Defendant admitted that he did no on site work for Watson, but felt he should be paid for the time spent on his estimate and other preparation work regardless of the fact he did not charge for those estimates:
"Q. * * * since [Watson] did hire you for a job, all of a sudden she owes you money [for the estimate]?"
"A. It's included. That's included in the price, yes."
Defendant recanted his implication that he should be reimbursed for the benefit of his contractor's discount when the State mentioned that such an act might be construed as an illegal kickback.
 {¶ 25} On the date of trial, Defendant insisted that he did "the best [he] could to cooperate with [Watson]. * * * [S]he never contacted [him] after July 13th." Defendant believed that Watson had breached the contract.
 {¶ 26} After reviewing the evidence in this case, we cannot say that the verdict was against the manifest weight of the evidence. Defendant's failure to contact Watson, and absolute indifference regarding holding Watson's money for over a year, leaves an implication that Defendant had no intention of completing any work for Watson. The jury could, therefore, have found that Defendant took Watson's $1,900 deposit with no intention of providing consideration for that money. A finding that a conviction is supported by the weight of the evidence, also includes a finding of sufficiency of the evidence. Smith
at ¶ 9, quoting Roberts, supra, at 4. Accordingly, we overrule Defendant's assignment of error.
 {¶ 27} We overrule Defendant's assignment of error and affirm the judgment of the Summit County Court of Common Pleas.
Judgment affirmed.
Carr, P.J. and Whitmore, J. concur.